**[J-87-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : | No. 10 EAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court at No. 2445 CD |
| | : | 2009 filed 8/7/2015 reversing and |
| | : | remanding the Order, dated 11/10/2009 |
| v. | : | in the Court of Common Pleas, |
| | : | Philadelphia County, Civil Division at |
| | : | No. 03055, July Term, 2009. |
| CITY OF PHILADELPHIA AND | : | |
| PHILADELPHIA COMMISSION ON | : | ARGUED: September 13, 2016 |
| HUMAN RELATIONS, | : | |
| | : | |
| Appellants | : | |


**OPINION ANNOUNCING THE JUDGMENT OF THE COURT**


**JUSTICE MUNDY**                                                          **DECIDED: April 26, 2017**

This case comes to us for a second time to determine if the Southeastern Pennsylvania Transportation Authority (SEPTA) is exempted from the jurisdiction of the City of Philadelphia (the City) via the Philadelphia Commission on Human Relations (Philadelphia Commission) and the provisions of the Philadelphia Fair Practices Ordinance (FPO). We previously remanded this case to the Commonwealth Court to ascertain the legislative intent regarding this issue by employing the analysis set forth by this Court in Dep't of Gen. Serv. v. Ogontz Area Neighbors Ass'n, 483 A.2d 448 (Pa. 1984). *See* Southeastern Pennsylvania Transp. Auth. v. City of Philadelphia, et al., 101 A.3d 79, 90-91 (Pa. 2014) (SEPTA III). On remand, the Commonwealth Court determined that, applying the Ogontz test, the language and statutory scheme of the

relevant statutes revealed the legislature's intent to exempt SEPTA from actions brought under the FPO. Southeastern Pennsylvania Transp. Auth. v. City of Philadelphia, et al., 122 A.3d 1163, 1173 (Pa. Cmwlth. 2015) (SEPTA IV). For reasons that follow, we affirm the decision of the Commonwealth Court.

This Court recounted the early procedural history of this case in our SEPTA III opinion, which we set forth again here.

> This case has its origins in seven administrative proceedings against SEPTA that individuals instituted with the Philadelphia Commission from July 2007 through April 2009, alleging violations of the FPO.[2] At least two of the administrative complaints included claims of types of discrimination against which the FPO offers protection, but that the Pennsylvania Human Relations Act ("PHRA")[3] does not cover. SEPTA filed a motion to dismiss each of the administrative cases for lack of jurisdiction, and the Philadelphia Commission denied the motions.
>
> While all seven administrative proceedings were still pending,[] SEPTA instituted this civil action against Appellants seeking both declaratory and injunctive relief. SEPTA maintained in its complaint[] that because it is a Commonwealth agency, and Appellants are a political subdivision and a municipal agency, respectively, the FPO does not apply to it, and the Pennsylvania Constitution barred Appellants from exercising jurisdiction over it.[]
>
> Appellants filed preliminary objections demurring to SEPTA's complaint. Appellants argued that because Philadelphia's powers under the First Class City Home Rule Act[7] [(FCCHRA)] extend to enacting and enforcing anti-discrimination laws, the FPO applied to SEPTA and the Philadelphia Commission had jurisdiction over it. Appellants further contended that an original action for declaratory and injunctive relief was inappropriate because SEPTA had to await final agency decisions in the individual administrative cases against it before it could seek appellate review in court. In response, SEPTA pointed out that the statute authorizing the creation of metropolitan transportation authorities, such as SEPTA, provides that such an authority "shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof," 74 Pa.C.S. § 1711(a), and asserted that Philadelphia's authority as a home-rule jurisdiction extends only to the regulation of its municipal affairs. In its brief in opposition to the preliminary objections, SEPTA did not rely upon, or refer to in any manner, the section of its enabling legislation pertaining to sovereign and official immunity. 74 Pa.C.S. § 1711(c)(3). The trial court sustained the preliminary objections and dismissed SEPTA's

complaint.[]

SEPTA appealed to the Commonwealth Court, which reversed. *SEPTA v. City of Philadelphia,* 20 A.3d 558 (Pa. Cmwlth. 2011) (*en banc*) [(Septa II)]. A majority of the court concluded that the Philadelphia Commission lacked jurisdiction because SEPTA is an "agency and instrumentality" of the Commonwealth and therefore within the jurisdiction of the Pennsylvania Human Relations Commission (the "State Commission"). The majority noted that the State Commission is responsible for the administration of the PHRA, which bans any "employer" from engaging in certain forms of discrimination. 43 P.S. §§ 955, 956(a). Because the PHRA defines "employer" as including "the Commonwealth or any political subdivision or board, department, commission or school district thereof,"[9] and because neither the PHRA nor the FPO explicitly grants the Philadelphia Commission jurisdiction over SEPTA, the majority concluded the State Commission—and not the Philadelphia Commission—had jurisdiction over SEPTA. The Commonwealth Court did not base any portion of its reasoning upon the section of SEPTA's enabling legislation pertaining to sovereign and official immunity. 74 Pa.C.S. § 1711(c)(3). Because the majority considered the State Commission's jurisdiction over SEPTA to be clear, and a Commonwealth instrumentality's challenge to "the scope of a governmental body's action pursuant to statutory authority" through a declaratory judgment action to be proper, the majority also concluded that SEPTA had no duty to exhaust its administrative remedies before seeking relief in court. SEPTA [II], *supra* at 563.

[] Judge Dante Pellegrini dissented. He concluded that SEPTA is not a Commonwealth agency, and even if it were, it would still be subject to the provisions of the FPO and the jurisdiction of the Philadelphia Commission. The dissent stated that the General Assembly had enacted the portion of SEPTA's enabling act that provides that a metropolitan transportation authority such as SEPTA is "an agency and instrumentality thereof" merely to avoid constitutional and statutory questions, such as limitations on local governments' acquisition of debt. 74 Pa.C.S. § 1711(a). The dissent opined that the cited language was not intended to render SEPTA a state agency for all purposes.

The dissent then concluded that even if SEPTA were part of the Commonwealth government, it nonetheless would be subject to the jurisdiction of the Philadelphia Commission under Commonwealth v. Ogontz Area Neighbors Association, 505 Pa. 614, 483 A.2d 448, 452 (1984). In that case, the Department of Public Welfare ("DPW")—which we characterized as "an agency of the Commonwealth"—applied to the City of Philadelphia for the permits needed to build a facility for the mentally handicapped. Id. at 449–50. The City denied the permits on the ground that the proposed facility did not comply with use and other

restrictions under the Philadelphia Zoning Code. On review in this Court, we rejected the notion that DPW was immune from local land regulations because it had the power to condemn property to establish the facility it sought to construct. We reasoned that because the General Assembly had established both the City and DPW, and had fixed the extent of each entity's powers, we would need to examine the enabling act of each entity to determine which entity's authority the legislature had intended to prevail for purposes of the parties' controversy. Because the applicable statutes did not clearly state which entity the legislature had intended to be "preeminent," we applied the rule of statutory construction that a court may determine legislative intent by considering "the consequences of a particular interpretation." Id. at 455 (citing 1 Pa.C.S. § 1921(c)(6)). Because Philadelphia's zoning scheme would have been frustrated if DPW were to have prevailed, while subjecting DPW to local zoning rules and restrictions would not necessarily have frustrated DPW's mandate to establish mental health facilities, we concluded that the legislature had intended the City to have priority in the circumstances at issue.

The dissent here applied the principles we set forth in Ogontz and concluded that, as in Ogontz, the relevant statutes were ambiguous as to which entity was intended to have priority. The dissent therefore considered the effect of holding each entity preeminent and determined that ruling in SEPTA's favor would frustrate the legislature's intended scheme. Characterizing the PHRA as granting the State and Philadelphia Commissions' "concurrent jurisdiction," the dissent explained that deeming SEPTA "preeminent" over Appellants would thwart the legislatively established system of shared jurisdiction. The dissent explained that, on the other hand, treating Appellants as "preeminent" would not interfere with SEPTA's purpose of providing public transportation. The dissent stated, "All the consequence of the City's and the [State Commission's] preeminence means is that SEPTA would still have to respond to complaints, like private companies, of those choosing to file their claims of unlawful discrimination with [the Philadelphia Commission]." SEPTA [III], *supra* at 569 (Pellegrini, J., dissenting).

_____

[2] In general terms, the FPO protects against discrimination: in employment based upon a person's race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status; in public accommodations based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, familial status, or domestic or sexual violence victim status; and in housing accommodation, commercial property and other real estate opportunities based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry,

disability, marital status, age, source of income, familial status, or domestic or sexual violence victim status. Phila. Code §§ 9–1103, 1106, 1108.

[3] 43 P.S. §§ 951–963. The PHRA protects most, but not all, of the categories of individuals covered by the FPO. In general terms, the PHRA protects against discrimination in employment, housing, and public accommodation because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, and national origin. In addition, it prohibits discrimination based upon the use of a guide or support animal because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals.

. . .

[7] 53 P.S. §§ 13101–13157.

. . .

[9] 43 P.S. § 954.

SEPTA III, 101 A.3d at 82-84 (some citations and footnotes omitted).

In reviewing the Commonwealth Court's SEPTA II decision, we held that the Commonwealth Court's reliance on the status of SEPTA as a Commonwealth agency, was not dispositive of the issue of preemption. Citing Ogontz, County of Venango v. Borough of Sugarcreek, 626 A.2d 489, 490 (Pa. 1993), and Hazleton Area Sch. Dist. v. Zoning Hearing Bd., 778 A.2d 1205, 1210 (Pa. 2001), we explained that a governmental entity, that derives its existence from the legislature, does not possess inherently superior powers over another such legislatively created entity by virtue of its type or the entity's respective designation as "Commonwealth" or "municipal." SEPTA III at 87. Rather, the question must be resolved through an inquiry into the legislative intent as revealed by the pertinent enabling legislation. Thus, we rejected SEPTA's structure-based argument that for a Municipal Authority to exercise jurisdiction over a Commonwealth agency, it was necessary for the legislature to expressly so provide. Id. at 87-88. We similarly rejected the Appellants' argument that the presumed validity afforded Home Rule enactments resolved the issue of legislative intent. Id. at 88. We,

therefore, held that the Commonwealth Court should have pursued an inquiry into the legislative intent in accordance with the stepped analysis first enunciated in Ogontz.

> As identified in Hazleton, our opinion in Ogontz, *supra* sets forth the analytical process a court is to follow to determine which entity the legislature intended to have preeminent powers over a given area of regulation.
>
>> The first step requires the reviewing court to determine, through examination of the statutes, which governmental entity, if any, the General Assembly expressly intended to be preeminent. Id. In the event there is no such express legislative mandate, the second step requires the court "to determine legislative intent as to which agency is to prevail . . . . turn[ing] to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia,* of the consequences of a particular interpretation."
>
> Hazleton, *supra* at 1210 (quoting Ogontz, *supra* at 455 (citing in turn 1 Pa.C.S. § 1921(c)(6))) (emphasis omitted).

Id. at 87. In essence, we rejected the Commonwealth Court's status-based analysis and remanded for it to ascertain the legislative intent by applying the Ogontz test to the entities' respective enabling legislation.[1] Id.

On remand, a majority of the Commonwealth Court sitting en banc addressed the first prong of the Ogontz test, which it phrased as "determin[ing] whether one legislative scheme was intended to have priority over the other." SEPTA IV, 122 A.3d at 1168. Looking at the respective legislative schemes, the Majority noted the Metropolitan

---

[1] Chief Justice Castille and Justice Eakin filed concurring and dissenting opinions expressing the view that Ogontz should not have applicability beyond the land use and zoning issues involved therein. SEPTA III, 101 A.3d at 92-93 (Castille, C.J. concurring and dissenting); Id. at 97 (Eakin, J. concurring and dissenting). Chief Justice Castille opined that the Commonwealth Court sufficiently reviewed the relevant statutory language and properly concluded it precluded enforcement of the FPO against SEPTA. "No remand to assess legislative intent is called for in this matter because the Commonwealth Court appropriately ascertained and effectuated the General Assembly's intent by looking to, and applying, the plain language of the relevant statutory provisions." Id. at 95; *accord* Id. at 98 (Saylor, J. dissenting).

Transportation Authorities Act (MTAA) established that SEPTA is a Commonwealth agency and instrumentality. Id. at 1169 (quoting 74 Pa.C.S. § 1711(a)). It further noted the MTAA afforded SEPTA sovereign and official immunity. Id. at 1169-70 (quoting 74 Pa.C.S. § 1711(c)). The Majority observed that 1 Pa.C.S. § 2310 provides that agencies with sovereign immunity may only be sued "where the legislature has *expressly waived* immunity." Id. at 1170 (quoting Ebersole v. Southeastern Pennsylvania Transp. Auth., 111 A.3d 286, 289 (Pa. Cmwlth. 2015) (emphasis added in SEPTA IV)). The Commonwealth Court then reviewed the PHRA, which expressly waives immunity of Commonwealth agencies from actions initiated under it. Id. (citing 43 P.S. § 954). In contrast, the Majority concluded the FCCHRA, which is the source for the City's authority to enact the FPO, does not contain an express waiver of the immunity accorded to Commonwealth agencies. Id. at 1171. The Majority explained that the FPO authorizes private claims, including potential awards for compensatory damages, punitive damages and attorney fees. Id., (citing PHILA. CODE §§ 9–1105, 9–1107). It, therefore, distinguished the provisions of the FPO from the land use and traffic regulation enforcement disputes that were the subjects of earlier cases. Id. at 1171-1172. "The penalties authorized by the [FPO] require an express waiver of sovereign immunity, and none has been expressed by the General Assembly." Id. at 1172.

The Majority rejected the City's argument that Section 12[2] of the PHRA accomplishes a waiver of sovereign immunity relative to the FPO. It noted that the

---

[2] The relevant section provides as follows.

> (a) The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply.

> (b) Except as provided in subsection (c), nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or

(continued…)

legislature waived SEPTA's immunity only as to the jurisdiction of the State Commission, and that such waivers are to be narrowly construed.  Id., at 1172-73 (citing Dean v. Dept. of Transp., 751 A.2d 1130, 1134 (Pa. 2000)).[3]

Judge Pellegrini filed a dissent in which he argued an interpretation of the statutory language as revealing the intent of the legislature to subject SEPTA to the jurisdiction of the FPO.  Id. at 1176 (Pellegrini, J. dissenting).  Judge Pellegrini argued that the designation of SEPTA as a Commonwealth agency does not afford it equivalency with the Commonwealth for all purposes, citing cases holding SEPTA's status as a Commonwealth agency is related to the reasons for its creation.  Id. at 1177.   He notes SEPTA is an "authority" tasked with providing a commercial service. Id.  He noted the subject matter in question here, anti-discrimination enforcement, is removed from SEPTA's fundamental transportation function.  That is, SEPTA provides a service, not the governing function that appertains to municipalities.  Id.  Judge Pellegrini viewed the authority afforded the City through the FCCHRA, and section 12 of the PHRA, which permits local governments to concurrently promulgate and enforce

---

(…continued)
> hereafter adopted municipal ordinance, municipal charter or of any law of this Commonwealth relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability[.] . . . In the event of a conflict between the interpretation of a provision of this act and the interpretation of a similar provision contained in any municipal ordinance, the interpretation of the provision in this act shall apply to such municipal ordinance.

43 P.S. § 962(a), (b).

[3] Acknowledging in light of its holding that it was unnecessary to reach the issue, the Commonwealth Court Majority also proceeded to determine that under the second prong of the Ogontz test a review of the consequences of the competing interpretations of the statutes favored the same conclusion relative to the legislature's intent. SEPTA IV, 122 A.3d at 1175.

anti-discrimination ordinances, as revealing a statutory scheme where the City predominates over SEPTA in the arena of enforcing anti-discrimination laws. Id. at 1183. He concluded "[t]here is nothing in the legislative scheme that would suggest that SEPTA's interests should predominate over the Commonwealth's; everything suggests [the City's] governmental interest predominates." Id. at 1179. Judge Pellegrini also argued that, to the extent SEPTA may be protected by sovereign immunity, such was limited to monetary damages but does not extend to other forms of relief the Philadelphia Commission has at its disposal. Id. at 1182.[4]

Appellants contend that, in SEPTA III, this Court resolved the first prong of the Ogontz test in their favor, and that the Commonwealth Court erred in ignoring that holding. Appellants' Brief at 24. Appellants argue that the Commonwealth Court Majority "revives the very presumption in favor of SEPTA that this Court directed that it avoid." Id. at 25. In line with its arguments in the prior appeal, Appellants emphasize that the FCCHRA grants the City authority to legislate for its municipal functions as fully as could the Commonwealth's legislature, absent an explicit or implicit preemption by the General Assembly. Id., (citing Warren v. City of Philadelphia, 115 A.2d 218, 221 (Pa. 1955)). This includes the authority to enact the FPO. Id. at 26 (citing Devlin v. City of Philadelphia, 862 A.2d 1234 (Pa. 2004)). Appellants also rely on the provisions and history of the PHRA, which contemplates concurrent, and perhaps more stringent, local

---

[4] Judge Simpson authored a separate dissent declaring his view that the matter should be remanded to develop a record about the effects enforcement of the FPO would have on SEPTA's ability to attend to its core functions. SEPTA IV, 122 A.3d at 1185 (Simpson, J, dissenting). Judge Pellegrini agreed that the record was underdeveloped and would also remand. He further expressed his reasons why he deems the Majority's conclusion, that the impact of such enforcement would be daunting, to be "specious." Id. at 1183. Because we agree that, under the first prong of the Ogontz test, the legislative scheme reveals an intent to shield SEPTA from the FPO, we do not reach, and express no opinion about, the impact on the respective entities of enforcement or non-enforcement under the second part of the Ogontz test.

regulation and enforcement in the anti-discrimination arena. Id. at 27. Additionally, Appellants reference the presumptive validity of a municipality's enactments under the Home Rule powers. Id. at 28. Appellants assert that the FCCHRA contains no indication that SEPTA should be excluded from the purview of the Philadelphia Commission's jurisdiction.

Appellants dispute the Commonwealth Court Majority's conclusion that the language and statutory scheme of the MTAA evinces an intent that SEPTA is excluded from the jurisdiction of the Philadelphia Commission and the FPO. Appellants assert that the MTAA's provisions conferring sovereign immunity upon SEPTA "do[] not speak to the authority of a municipality to enforce validly-enacted and generally applicable local anti-discrimination legislation against SEPTA," or to legislative intent on the issue. Id. at 31. Appellants claim the Commonwealth Court's reasoning adopts the rationale in Chief Justice Castille's dissent, which they assert we rejected in SEPTA III. Id. at 31-32. Appellants argue that relying upon the grant of sovereign immunity in this instance essentially resurrects the presumption and status-based approach favoring Commonwealth agencies that this Court disapproved. Appellants note that the fact SEPTA enjoyed sovereign immunity was not dispositive in Ogontz, where we held SEPTA was not exempt from the City's enforcement of its zoning regulations. Id. at 33-34.

Appellants next argue that the fact that the legislature expressly waived SEPTA's immunity in the PHRA is unavailing to SEPTA because legislative intent as to priority is not discerned by a determination of whether or not a third entity has a role to play, and because the scope of protections afforded by the FPO are greater than those afforded by the PHRA. Id. at 34-35. Finally, Appellants suggest that, to the extent SEPTA's sovereign immunity acts as a bar to enforcement of the FPO against it, it does not

implicate all of the enforcement tools available to the Philadelphia Commission. Id. at 37. Sovereign immunity, they point out, has been held to pertain to awards of monetary damages, but not other forms of equitable and declaratory relief. Id. at 38-39.[5] "To argue, based on sovereign immunity, that the General Assembly has expressly abrogated all of the [Philadelphia] Commission's jurisdiction, ignores that the bulk of the [Philadelphia] Commission's work is essentially investigatory and administrative." Id. at 40.

---

[5] Appellants cite the following cases in support of this contention.

> *See* Legal Capital, LLC. v. Medical Professional Liability Catastrophe Loss Fund, 750 A.2d 299, 302-03 (Pa. 2000) (sovereign immunity did not bar action seeking equitable relief or a declaratory judgment that plaintiff's assignee was entitled to direct payments from the Medical Professional Liability Catastrophe Loss Fund, a Commonwealth executive agency); Wilkinsburg Police Officers Ass'n By and Through Harder v. Com., 636 A.2d 134, 137 (Pa. 1993) ("suits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity"); Fawber v. Cohen, 532 A.2d 429, 433-34 (Pa. 1987) ("suits which . . . seek to restrain state officials from performing affirmative acts are not within the rule of [sovereign] immunity" – thus, action, which seeks to restrain the Secretary of Welfare and declare his regulations invalid, is not an action for which the Secretary enjoys sovereign immunity); Finn v. Rendell, 990 A.2d 100, 105 (Pa. Cmwlth. 2010) ("sovereign immunity does not bar a declaratory judgment action or injunction seeking to prohibit state parties, i.e., state agencies or employees, from acting"); Stackhouse v. Com., Pennsylvania State Police, 892 A.2d 54, 59–60 n.6, 61 (Pa. Cmwlth. 2006) ("sovereign immunity [does not] bar[] claims. . . seeking prohibitory injunctions to restrain state action" or "a mandamus action to compel an agency or officer to perform a ministerial or mandatory statutory duty"); McGriff v. Com., Pennsylvania Bd. of Probation and Parole, 561 A.2d 78, 80 (Pa. Cmwlth. 1989) (sovereign immunity was not a proper defense to parolee's mandamus petition seeking to compel Board of Probation and Parole to vacate its recommitment order after parolee's original sentence had been vacated).

Appellants' Brief at 37-38.

The State Commission filed an amicus brief in support of Appellants. It advances the argument that the PHRA expressly provides for concurrent jurisdiction and liberal construction. The State Commission's Amicus Brief at 2. It argues SEPTA meets the definition of a local employer under the PHRA and notes that cases favor "robust" application of anti-discrimination laws. Id. at 4-5. The State Commission argues that its interpretation of the PHRA is entitled to deference as the agency charged with implementing the statute. Id. at 6-7 (citing Office of Admin. v. Pa. Labor Rels. Bd., 916 A.2d 541, 549 (Pa. 2007)).

American Civil Liberties Union of Pennsylvania (ACLU) and the Mazzoni Center Legal Services (Mazzoni Center) filed a joint Amicus brief. They reiterate the provisions of the PHRA allowing local ordinances to provide concurrent and greater enforcement. ACLU and Mazzoni Center's Amicus Brief at 22-23. They note that the PHRA and the FCCHRA predate the MTAA which created SEPTA. They argue the enactment of the MTAA did not alter the dual jurisdiction paradigm. Id. at 24. They further argue the MTAA did not meet the criteria under the Statutory Construction Act for repealing those earlier enactments, because it did not constitute a revision of all statutes on a subject, or purport to establish a uniform and mandatory system over the subject matter at issue. Id. at 25-26.[6]

SEPTA refutes Appellants' argument that the Commonwealth Court Majority did not properly apply the Ogontz test to the pertinent statutes in this case. SEPTA's Brief at 10. It argues that the Commonwealth Court did not resurrect a status-based priority of SEPTA over the City. Rather, it asserts the Commonwealth Court focused on the intent of the legislature relative to the City's exercise of jurisdiction over SEPTA. Id. at

---

[6] Again, in light of our disposition, we do not address the Amici's arguments related to the second prong of the Ogontz test.

10-11. SEPTA counters Appellants' assertion that the broad powers afforded the City under the FCCHRA support an inference of the legislative intent respecting preemption. SEPTA argues it ignores our holding in SEPTA III, where we stated the presumption of validity is relevant to the authority to act, and not "whether the municipality may enforce ordinances and regulations against a Commonwealth agency or instrumentality." Id. at 16 (quoting SEPTA III, 101 A.3d at 88). SEPTA argues that the MTAA plainly establishes that SEPTA is afforded sovereign immunity. Id. at 18. It notes such immunity must be expressly waived to permit suits against it. Id. at 19 (citing Powell v. Drumheller, 653 A.2d 619, 621 (Pa. 1995); Tork-Hiis v. Com., 735 A.2d 1256, 1258 (Pa. 1999)). SEPTA notes such a specific waiver is present in the PHRA, but not in the FCCHRA. Id. at 20.

SEPTA argues that, contrary to Appellants' assertions, the Commonwealth Court did view the Ogontz test "through the lens of the specific municipal ordinance. . . sought to be enforced," and did not hold that sovereign immunity creates a per se exemption from all municipal jurisdiction. Id. at 21-22. Thus, SEPTA asserts the distinction drawn by the Commonwealth Court between the land use issues, applicable in Ogontz, and the regulations present in the FPO, which include rights of private action and the award of damages, is valid. Id. at 24-25. SEPTA argues Appellants' parsing of the potential enforcement remedies available under the FPO to support an inference of legislative intent to permit the Philadelphia Commission's partial jurisdiction over it is inapposite. Id. at 33-34.

Appellants sought allowance of appeal, which we granted for decision on the following question, as framed by Appellants:

> Did the General Assembly, when it gave Philadelphia general police powers as expansive as [those] of the General Assembly and specific authority to enact local anti-discrimination laws, intend to exempt SEPTA from compliance with those laws, when the consequence of *compliance*

would not materially disrupt SEPTA's core transportation function and the consequence of *non-compliance* would leave hundreds of thousands of Philadelphia passengers and employees without a remedy against many forms of discrimination?

SEPTA v. City of Phila., 133 A.3d 292 (Pa. 2016).[7]

## A.

Initially, we address Appellants' assertion that this Court essentially resolved the first prong of the Ogontz test prior to our remand to the Commonwealth Court in SEPTA III. That assertion is mistaken. Ogontz is implicated when a question arises as to legislative intent respecting competing interests between distinct entities created by the legislature. In SEPTA III, we held SEPTA was "wrong in asserting that, in order for a local governmental agency to prevail over a Commonwealth agency or instrumentality, the legislature must have clearly stated its intent in that regard." SEPTA III, 101 A.3d at 87. Rather, we explained "we have applied the Statutory Construction Act in order to discern the legislature's intent." Id. We further held that SEPTA's status-based argument and the City's reliance on the presumptive validity of homerule enactments did not provide such an express directive. Id. at 88. Therefore, we held that it was incumbent upon the Commonwealth Court to apply the two-part test set forth in Ogontz. Id. at 90. The first prong of that analysis requires an examination of the overall language of the legislation to discern if the General Assembly expressly intended one or the other to be preeminent. Ogontz, 483 A.2d at 455. While it is undisputed that neither enabling statute contained an explicit provision directly addressing the issue, that fact did not preclude the possibility that an examination of the statutes as a whole would reveal such a clear intent. Our holding merely recognized that the Commonwealth

---

[7] As in our earlier review of this case, the issue before us is one of statutory interpretation. "Our standard of review of such a question of statutory interpretation is de novo, and our scope of review is plenary." SEPTA III, 101 A.3d at 87 (citing Hazelton, 778 A.2d at 1213).

Court in SEPTA II did not perform a review to discern the legislature's intent because it relied on the status of SEPTA as a Commonwealth agency, treating the competing entities in a hierarchical manner. SEPTA III, 101 A.3d at 87. We also noted that, as of the time of the appeal in SEPTA III, SEPTA had not relied on the sovereign immunity provisions and the Commonwealth Court did not base any of its reasoning thereon. Id. at 83. Accordingly, we did not determine the first prong of the Ogontz analysis, and the Commonwealth Court, on remand, correctly engaged in an independent review of the enabling statutes to determine if the relevant legislative intent was therein expressed.[8]

**B.**

We next address Appellants' arguments that are reflected in Judge Pellegrini's dissent. Appellants adopt an approach that focuses on the core functions of the respective entities. This reliance on the core functions of SEPTA and the City, and Judge Pellegrini's distinction between an "authority" providing a service and a municipality with governing authority, essentially turns the status-based analysis of the Commonwealth Court in SEPTA II on its head. Instead of prioritizing Commonwealth agencies over municipalities absent an express contrary intent by the legislature, Appellants would prioritize based on the governing versus the service-providing function of the respective entities. This is merely a different version of the status-based approach we rejected in SEPTA III. "In a series of cases beginning with our decision in

---

[8] Similarly, contrary to Appellants' assertions, the SEPTA III majority did not reject Chief Justice Castille's analysis of the legislative intent. His position that Ogontz should not apply beyond its facts was not agreed to by the majority, but the majority did not reach or opine on whether or not legislative intent was clear in the language of the statutes. The Court instead remanded for the Commonwealth Court to address the issue in the first instance, under the proper standard. As such, at most, the majority position was that Chief Justice Castille's analysis was premature. See SEPTA III, 101 A.3d 87-88.

Ogontz, *supra,* this Court has held that a Commonwealth agency's challenge to a municipality's exercise of authority over it does not represent a contest between superior and inferior governmental entities, but instead a contest between two instrumentalities of the state." Id. at 87 (quoting Ogontz, 483 A.2d at 452) (other citations omitted). The considerations reflected in Appellants' arguments may be relevant in the performance of the second part of the Ogontz analysis, if necessary, but are not indicative of the legislature's intent in the first part, which focuses on the language of the pertinent statutes. *See* id.

### C.

We turn then, to our de novo review of the authorizing statutes to discern if the legislature has expressed an intent to exempt SEPTA from enforcement of the FPO. Reviewing the legislation establishing the City's authority under Home Rule and the legislation creating SEPTA, we note several facts are undisputed. Respecting SEPTA, it is clear the MTAA provides that SEPTA exercises its public powers as an agency of the Commonwealth. 74 Pa.C.S. § 1711(a). It is equally undisputed that the MTAA extends sovereign immunity to SEPTA. Id. at § 1711(c) (referencing 1 Pa.C.S. § 2310, which states that sovereign immunity continues until "specifically waived" by the General Assembly); *see also* Frazier v. W.C.A.B. (Bayada Nurses, Inc.), 52 A.3d 241 (Pa. 2012) (holding subrogation claim against SEPTA under the Workers Compensation Act was barred on the basis of sovereign immunity).

The authority of the City to enact the FPO and to enforce its provisions within Philadelphia is also not contested. That authority stems from the FCCHRA, which grants broad powers to the City to legislate in any non-prohibited field pertinent to its

municipal functions. *See* 53 P.S. §§ 13101-13157. Additionally, the PHRA specifically provides that its provisions do not interfere with the authority of a municipality to pass appropriate ordinances and enforce anti-discrimination provisions concurrently with the State Commission. *See* 43 P.S. § 962(a), (b).

As recognized by the Commonwealth Court majority, these clear provisions show the legislature intended to shield SEPTA from entities initiating suits against it. The general authority of the City to legislate in this area, simply does not address the issue of its jurisdiction over SEPTA. In contrast, the sovereign immunity provisions do create an express limitation on any entity in bringing suit against SEPTA. We recognize that the legislature specifically waived sovereign immunity for Commonwealth agencies for purposes of enforcement of the PHRA. 43 P.S. § 954. It does not follow that the waiver of immunity piggybacks to the FPO merely because local municipalities are permitted to exercise concurrent enactment and enforcement authority with the State Commission with respect to the subject matter at issue. Rather, Section 954 is an explicit expression of the legislature's intent to grant the State Commission exclusive jurisdiction over Commonwealth agencies in anti-discrimination matters. As noted above, any waiver of sovereign immunity must be specifically enacted by the legislature. 1 Pa.C.S. § 2310. No such waiver appears in the City's Home Rule authorization or SEPTA's enabling legislation. The fact that the FPO has an array of enforcement options does not provide a basis to infer the legislature intended only a partial exemption. As SEPTA suggests, this would require a selective reading of the FPO.[9]

---

[9] Our holding does not do harm to our deference to the State Commission in matters of statutory interpretation under its purview. First, such deference must give way to clear (continued…)

In conclusion, the Commonwealth Court did not err in its determination that, under the first prong of the Ogontz analysis, the statutory language and legislative scheme of the enabling legislation disclosed the legislature's intent to exclude SEPTA from the jurisdiction of the FPO. We, therefore, affirm the order of the Commonwealth Court.

Chief Justice Saylor and Justice Baer join the opinion.

Chief Justice Saylor and Justice Wecht file concurring opinions.

Justice Donohue files a dissenting opinion in which Justices Todd and Dougherty joins.

---

(…continued)
language of the legislature. Com., Office of Admin. v. Pennsylvania Labor Relations Bd., 916 A.2d 541, 550 (Pa. 2007). Second, the source of the statutory language evidence the General Assembly's intent on this issue stems from the MTAA, over which the PHRA has no interpretive function.